# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### OCALA DIVISION

GERARD OLBEK and ASHLEY
ROGERS,

      Plaintiffs,

v.                               Case No: 5:19-cv-138-Oc-30PRL

CITY OF WILDWOOD, FL, and JASON
MCHUGH,

      Defendants.

_____

## <u>ORDER</u>

THIS CAUSE comes before the Court upon Defendant City of Wildwood's Motion for Summary Judgment against Plaintiffs (Dkt. 34), Defendant Jason McHugh's Motion for Summary Judgment against Plaintiffs (Dkt. 35), and Plaintiffs' Responses in Opposition (Dkts. 36 and 37). The Court, having considered the motions, responses, record evidence, and being otherwise advised in the premises, concludes that Defendants' motions should be granted, and final judgment should be entered in Defendants' favor on Plaintiffs' First Amendment retaliation claims and Florida Whistleblower claims.

## RELEVANT FACTS[1]

Plaintiffs Gerard Olbek and Ashley Rogers ("Olbek" and "Rogers," respectively) filed suit against the City of Wildwood (the "City") and Jason McHugh ("McHugh"), the

---

[1] These facts are interpreted in a light most favorable to Plaintiffs, the non-movants.

City Manager, for Defendants alleged violations of Plaintiffs' First Amendment right to free speech (Count I and Count III) and for violating Plaintiffs' rights under the Florida Whistleblower Act (Count II).[2]

Plaintiffs were former employees of the Wildwood Police Department.  Prior to their departure from the police department, Olbek was Deputy Chief of Police and Rogers was Captain of Professional Compliance.   Olbek's role as Deputy Chief was predominately administrative and included the daily operations of the agency, involvement in the police department's management and budgeting, and attendance at any management events that the Chief of Police was unable to attend.   Rogers' role as Captain of Professional Compliance primarily concerned internal affairs and revision of existing departments or policies.   Olbek was Rogers' supervisor.

On October 21, 2018, the building that housed the Wildwood Police Department was damaged as a result of an electrical fire.   The employees of the police department relocated to various temporary locations.   A few days after the fire, when McHugh did a walk-through to assess the building, Olbek attempted to discuss the building's mold and asbestos issues with McHugh.   Olbek mentioned that the building likely had asbestos and that all of the drywall in the building would have to be replaced because of mold.   McHugh said not to use "M word" and discouraged further discussion about the issues.   When Olbek raised his concerns with McHugh, there was a group of people present, including John Roper (a nonemployee reserve volunteer officer) and Melissa Tuck (human resources

---

[2]   Plaintiffs' claim under the Florida Whistleblower Act is only against the City.

director).   According to McHugh, given the seriousness of the concern, he believed that it was not a discussion they should be having in public.   Rather, such concerns should be brought to the attention of the Chief of Police or to McHugh privately.   Prior to the fire, McHugh was never made aware of a mold or asbestos problem in the building or with any employees claiming illness because of mold.

On November 13, 2018, Olbek sent a memorandum to Tuck via email, raising health issues involving mold and asbestos in the police department building ("Mold Memorandum").   All police department employees were copied on the Mold Memorandum to Tuck.   Olbek consulted with Rogers about the contents of the Mold Memorandum, but it was Olbek's initiative.   Rogers' name is not identified in the Mold Memorandum and he only assisted with proofreading and editing it.   Rogers was not aware of Olbek's intention to distribute the Mold Memorandum to everyone in the department.   The Mold Memorandum states as follows:

> Melissa,
>
> Over the past 15 years or so there have been numerous complaints to the city about the mold issues and the air quality leading to congestion, colds, migraines and general employee health issues.  The city has bleached mold off of the walls on numerous occasions, we have replaced walls and constantly battled moisture and there was testing and some type of mitigation some time possibly around 2009-2010 however the employees were not provided any information as to the results but air filtration units were purchased after the results.
>
> We just recently moved filing cabinets in September in an office to reveal a wall full of mold which the city later bleached.  Recent information confirms bleach does not kill mold of porous surfaces such as drywall, which has been the city's means of mold mitigation.  It is my understanding that recent tests have shown the building contains asbestos as well as mildew/mold, my question/request is can you please look into employee exposure testing options for mold and asbestos exposure for all police department personnel as soon as possible.
>
> Thank you for your time and support.

(Dkt. 34-3).

3

After receiving the Mold Memorandum, Tuck went to McHugh's office and showed it to him.   McHugh was about to leave for his wedding and honeymoon when he received it.   McHugh called Chief of Police Paul Valentino and expressed his frustration with him for his lack of lack leadership and control over the police department.

Both Rogers and Olbek learned that McHugh was upset about the Mold Memorandum because they were present with Chief Valentino when he received the phone call from McHugh.   Chief Valentino subsequently left the office to continue his discussion with McHugh privately.   According to Olbek, when Chief Valentino returned to the office, he told Olbek that McHugh was demanding Olbek's discipline and was not happy with him.   McHugh did not know of Rogers' involvement with the Mold Memorandum.

Olbek stated that he sent his memorandum to human resources pursuant to policies outlining his ability to do so and Chief Valentino's verification that he has a direct line of communication with human resources to address his concerns.   Although Chief Valentino did not state that Olbek has a direct line of communication with every employee of the police department, it was Olbek's understanding that he had direct communication with his employees within the department as they were his subordinates.

On November 15, 2018, Tuck sent a memorandum to Chief Valentino and Olbek in response to Olbek's Mold Memorandum.   Tuck advised that she would be investigating the claims and would provide a full report to McHugh within forty-five days.   Tuck also stated that, in light of the allegations in Olbek's Mold Memorandum and the recent fire damage to the police department building, she would be instituting several changes, effectively immediately.   The changes included removing and relocating the evidence

locker, only allowing authorized personnel in the building, and requiring a detailed list with the names of all individuals who entered the building, along with a date and time entry.

On November 16, 2018, after receiving Deputy Chief Olbek's memorandum, Corporal Russell W. Swartzfager sent a memorandum to Chief Valentino stating his intent to seek guidance to protect his interests and the interest of his employees.

On November 20, 2018, Tuck sent another memorandum to Chief Valentino and Deputy Chief Olbek requesting that all officers and staff who were assisting with evidence removal to use the appropriate personal protective equipment and to submit the daily list of employees entering and exiting the building no later than noon of the following day. On the same day, Tuck sent a second memorandum to Chief Valentino and Swartzfager (1) acknowledging receipt of Swartzfager's memorandum, (2) informing them that the police department building was closed until further notice while the allegations and concerns raised by both Swartzfater and Olbek were being investigated, and (3) encouraging police officers to seek immediate treatment and evaluation with the City's medical clinic.

Because Rogers believed that the City may cover up any mold or asbestos issues, he suggested taking wall samples from the building to Olbek.  This occurred after Tuck issued memoranda restricting access to the building.  Olbek, Rogers' supervisor, authorized Rogers to take the samples from the building.  Rogers then sought the assistance of Detective Christopher Smalt to take the samples.  Rogers was a higher-ranking officer than Detective Smalt.  On or around December 1, 2018, Smalt cut out samples of the drywall in the building.  The police department's log shows that Smalt

entered the building on December 1, 2018, identifying the reason for entry as "moving." But it is undisputed that Smalt's entry was for the purpose of cutting drywall samples, contrary to the orders of the human resources director.

On December 5, 2018, Assistant City Attorney Joshua Bills, Public Works Director Jeremy Hockenbury, and an air quality inspector whom the City retained, went to the police department building to examine the alleged mold issues.   Bills noticed that certain areas of drywall in the building were cut-out.   Bills notified his supervisor, Ashley Hunt, and McHugh of the missing drywall.   McHugh, Hunt, and Bills then examined the building and confirmed that the drywall had been cut.   When they exited the building, they inquired of the officers who were in the immediate area, which included Smalt, and they all denied having knowledge about the drywall.   In addition, the inspector performing mold testing in the building denied removing the drywall from the building and showed McHugh that his test would have looked like a small cut-out in the wall.   McHugh elected to have an outside agency, the Sumter County Sheriff's Department, conduct the investigation.   Hunt contacted the sheriff's department and requested a criminal investigation.   At the direction of Hunt, Bills completed the Intent to Prosecute and the sheriff's department commenced its investigation.   At that time, McHugh did not know who was responsible for the missing drywall.

Hunt called Chief Valentino and inquired about the drywall damage to the building. This is the first time Chief Valentino learned of the missing drywall.   Hunt informed Chief Valentino that the sheriff's office would be investigating criminal mischief.   When McHugh spoke to Chief Valentino about the incident, Chief Valentino told McHugh that

he did not know who cut the drywall.   McHugh told Chief Valentino that whoever cut the drywall needed to resign.

Immediately after Hunt and McHugh inquired about the drywall, Smalt contacted Mayor Ed Wolf and met with him shortly after.   Smalt and the Mayor were family friends and had known each other for a long time.   Smalt told the Mayor about who was involved in the drywall incident.

On December 6, 2018, McHugh and the City Attorney met with the Mayor.   During that meeting, the Mayor mentioned that he had confidential information regarding the drywall cut-outs that were discovered on December 5, 2018.   The Mayor did not provide the names of the parties responsible.

At some point after the investigation began, Olbek spoke to Chief Valentino and told him that he authorized Rogers to remove the drywall samples.   This was the first time that Chief Valentino learned who was involved in the drywall incident.   On or about December 6th or 7th, Chief Valentino told Olbek that if he and Rogers resigned, the City would drop the criminal investigation and permit them to retire in good standing.

Rogers had no communication with the investigators from the sheriff's office and made no effort to return their voicemail regarding the investigation.   Rogers testified that he was "terrified" of being subject to criminal charges.   But, he did not believe he was committing a crime or otherwise violating any policies when taking the drywall samples. Rogers also did not consult with a criminal defense lawyer about the situation.   Rogers discussed his resignation in lieu of prosecution with Chief Valentino over several telephone conferences.   Rogers did not consult with anyone about his resignation letter prior to

submitting it.   Similarly, although Olbek wanted to avoid being charged and prosecuted, he did not speak to the investigators handling the investigation, the State Attorney's office, or a criminal defense lawyer about the potential prosecution.   Olbek also did not believe he committed a crime.   Both Rogers and Olbek understood that the State Attorney's Office, not the City, made the decision to prosecute a case.   Likewise, they understood that the decision to charge them with a crime was up to the law enforcement officers investigating the case.

To avoid being disciplined and criminally charged, Rogers and Olbek provided notice of their retirement with a retirement effective date of December 23, 2018 on December 7, 2018 and December 10, 2018, respectively.   On December 13, 2018, McHugh acknowledged receipt of Plaintiffs' notices of retirement.   McHugh did not learn who was responsible for cutting the drywall until after Plaintiffs' resignations.   Once McHugh learned of the resignations, he made the decision to drop the investigation.   Smalt met with McHugh and the Mayor on December 16th or 17th and was informed that he would not be in trouble for his involvement with cutting the drywall because of Plaintiffs' resignations.

## LEGAL STANDARD

Motions for summary judgment should be granted only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   The existence of some factual disputes between the litigants will not

defeat an otherwise properly supported summary judgment motion; the requirement is that there be no genuine issue of material fact.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original).   The substantive law applicable to the claimed causes of action will identify which facts are material.   *Id.*   Throughout this analysis, the court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor.   *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial.   *Celotex*, 477 U.S. at 324.   The evidence must be significantly probative to support the claims.   *Anderson*, 477 U.S. at 248-49 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990).   [I]f factual issues are present, the Court must deny the motion and proceed to trial.   *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).   A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Hoffman v. Allied Corp.*, 912 F.2d 1379 (11th Cir. 1990). However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

## DISCUSSION

The City and McHugh seek summary judgment on Plaintiffs' claims for violating their First Amendment right to free speech.   The City also seeks summary judgment on Plaintiffs' Florida Whistleblower claims.   Plaintiffs are required to suffer an adverse employment action to prevail on both their First Amendment and Florida Whistleblower claims.   The Court will address this issue first.

## I.     Adverse Employment Action

Defendants assert that Plaintiffs were not subject to an adverse employment action because Plaintiffs resigned from their positions.   In response, Plaintiffs claim they were constructively discharged.   Specifically, Plaintiffs assert that their resignations were coerced because the City misrepresented to Plaintiffs that it had a basis to have them arrested and prosecuted.

The Court notes that employee resignations are presumed to be voluntary.   *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995).   The presumption prevails unless the employee provides sufficient evidence to establish that the resignation was involuntary.   *Id.*   To determine whether the resignation was involuntary, "the court must examine the surrounding circumstances to test the ability of the employee to exercise free choice."   *Id.*   An employee's resignation will be deemed involuntary (1) where the employer forces the resignation by coercion or duress, or (2) where the employer obtains the resignation by deceiving or misrepresenting a material fact to the employee.   *Id.*

Plaintiffs assert that Defendants used the sheriff's investigation to unlawfully coerce them to resign.   Factors to consider under the coercion theory include: "(1) whether the

employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; (4) whether the employee was permitted to select the effective date of the resignation; and (5) whether the employee had the advice of counsel." *Hargray*, 57 F.3d at 1568.

Whether an alternative to resignation was offered is gauged by an objective standard rather than the employee's subjective evaluation. *Hargray*, 57 F.3d at 1568. The fact that the employee may perceive his or her only option to be resignation is irrelevant. *Id*. "[R]esignations can be voluntary even where the only alternative to resignation is facing possible termination for cause or criminal charges." *Id.*

Here, both Rogers and Olbek made the decision to resign to avoid being disciplined and criminally charged. Rogers had no communication with the investigators from the sheriff's office and made no effort to return their voicemail regarding the investigation. Rogers did not believe he was committing a crime or otherwise violating any policies when the drywall samples were taken. Rogers received Olbek's authorization prior to the removal of the drywall. And, while Rogers testified that he was "terrified" of being subject to criminal charges, he did not consult with a criminal defense lawyer about the situation. (Dkt. 34-20, 50:14-22). Rogers discussed his resignation in lieu of prosecution with Chief Valentino over several telephone conferences. Rogers did not consult with anyone about his resignation letter prior to submitting it. Similarly, Olbek did not speak to the investigators handling the investigation, the State Attorney's office, or a criminal defense lawyer about the potential prosecution. Both Rogers and Olbek understood that

the State Attorney's Office, not the City, made the decision to prosecute a case and that the decision to charge them with a crime was up to the law enforcement officers investigating the case.

The Eleventh Circuit in *Hargray* briefly provided examples of situations where resignations were deemed involuntary based on coercion or duress. *Id.* at 1570. For instance, resignations were involuntary when an employee was told he had to sign a resignation letter before leaving the supervisor's room, when an employee was told that charges would be filed immediately despite requests to have more time and to consult with an attorney, and when employees were not permitted to leave an interrogation room without first signing the resignation letter and were threatened with adverse publicity, disclosure of allegations of allegations to their family, etc. *Id.* at 1570. Here, the record is void of any such evidence of coercion.

The Court concludes that Plaintiffs have not established that their resignations were involuntary or that they were otherwise unable to exercise free choice. Plaintiffs did not speak to the investigators from the sheriff's office, the State Attorney's office, McHugh, or a criminal defense lawyer about the investigation. Plaintiffs also understood that the decision to charge them with a crime was up to the officers investigating the case and the decision to prosecute the case was up the State Attorney's Office, not the City. Plaintiffs' subjective fears are irrelevant to the Court's inquiry of whether Plaintiffs' resignations were voluntary or involuntary. And, resignations may still be deemed voluntary if Plaintiffs' only alternative is facing criminal charges or termination. *Hargray*, 57 F.3d at 1568.

Plaintiffs generally argue in their response that the City misrepresented to them that it had a basis to have them arrested and prosecuted.   To the extent Plaintiffs claim their resignations were involuntary because of Defendants' misrepresentation, Plaintiffs did not further brief this issue and failed to provide record evidence in support of their contention. Moreover, as the Court previously noted, the decision to arrest and prosecute were not decisions made by the City.   Accordingly, Plaintiffs' resignations are deemed voluntary, unless the exception to the rule applies.

The exception to the voluntary resignation rule is "where the employer actually lacked good cause to believe that grounds for the termination and the criminal charges existed." *Hargray*, 57 F.3d at 1568.   Plaintiffs argue that the City lacked a good faith basis to believe that Plaintiffs committed a crime.   Specifically, Plaintiffs assert that the drywall samples they took had no value.   Plaintiffs argue that the City's filing an intent to prosecute over drywall with no value showed a lack of good cause.   Defendants assert that there is no factual support to support the exception to the rule.   The Court agrees.

On December 5, 2018, when McHugh first learned of the wall cut-outs, he became concerned that someone might be gathering evidence to sue the City.   And if it was done by a City employee, such conduct was in violation of Tuck's memoranda restricting access to the fire damaged building.   According to the record, as of November 15, 2018, only authorized personnel were allowed in the building and as of November 20, 2018, the police department building was closed.

When McHugh authorized an outside agency to perform an investigation of the cut drywall, (1) the police department building was closed until further notice, (2) only

authorized personnel were previously permitted in the building, (3) the air quality inspector who was performing mold testing denied cutting the drywall, and (4) the officers who were on the scene when McHugh confirmed that the drywall was cut denied any responsibility. McHugh also suspected that the incident involved a City employee.   The City Attorney was responsible for the specific type of investigation to be conducted and the criminal investigation commenced prior to knowing of Plaintiffs' involvement.   McHugh stated that he would stop the investigation if Chief Valentino provided him with the resignation of the person responsible for the cut-outs, assuming he or she was an employee of the police department.   Once Olbek's and Rogers' resignation papers were received on December 10, 2018, the investigation stopped and criminal charges were no longer pursued.

The record does not establish that Defendants lacked good cause to believe that grounds for termination and criminal charges existed.   Accordingly, the exception to the rule does not apply.   Plaintiffs' resignations are deemed voluntary and they were not subject to an adverse employment action.   In the absence of an adverse employment action, Plaintiffs' First Amendment retaliation claims and Florida Whistleblower claims fail.

## II.   Violation of Plaintiffs' First Amendment Right to Free Speech

Preliminarily, the Court notes that Defendants' alleged retaliation against Plaintiffs for exercising their right to free speech did not involve Plaintiffs' speech.   Rather, Plaintiffs' resignations were because of a criminal investigation concerning an unauthorized entry into and the defacement of the police department building.

But, even if Plaintiffs' resignation were because of their exercise of free speech (the Mold Memorandum), the Court concludes that there was no violation of Plaintiffs' First Amendment right.   To establish a claim for wrongful termination because of the exercise of free speech, the employee must show by a preponderance of the evidence that (1) the employee's speech is on a matter of public concern, (2) the employee's First Amendment interest in engaging in speech outweighs the employer's interest in prohibiting the speech in order to promote efficiency of the public services it performs through its employees, and (3) the employee's speech played a substantial part in the employer's decision to demote or discharge the employee.   *Stanley v. City of Dalton, Georgia*, 219 F.3d 1280, 1288 (11th Cir. 2000).   If the employee succeeds in establishing the foregoing, the employer must prove by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct.   *Id*.

Accordingly, the threshold inquiry for determining whether Plaintiffs' speech is protected requires Plaintiffs to prove that they spoke as citizens on a matter of public concern.   *Bott v. Bradshaw*, 791 Fed.Appx. 41, 45 (11th Cir. 2019); *D'Angelo v. School Bd. of Polk County, Fla.*, 497 F.3d 1203, 1211 (11th Cir. 2007).   If this threshold question fails, then the speech is not protected under the First Amendment.   *Id.*

### A. Rogers

Defendants argue that Rogers did not engage in any speech because he did not author, nor did anyone believe he authored, the Mold Memorandum.   In response, Plaintiffs argue that Rogers exercised his First Amendment right to engage in associative activity without retaliation.   The Court notes, however, that Plaintiffs did not bring a claim

to redress Plaintiffs' First Amendment *right to engage in associative activity*. Rather, according to Plaintiffs' Complaint, they filed a claim against Defendants for violating their First Amendment "right of free speech." (Dkt. 23, ¶ 1). Accordingly, any arguments from Plaintiffs regarding their right to engage in associative activity without retaliation is improper before the Court. The Court will only address arguments pertaining to the alleged violation of Plaintiffs' right to free speech, as alleged in their Complaint.

It is undisputed that Rogers did not author the Mold Memorandum. The Mold Memorandum does not contain Rogers' name or any reference to Rogers that suggests he had any involvement with it. Rogers does not refute Defendants' assertion that he did not engage in speech for purposes of his First Amendment retaliation claim. Both Rogers and Olbek further agree that there was no reason to believe that McHugh was aware or had reason to believe that Rogers authored the Mold Memorandum or otherwise participated in drafting it. Accordingly, the Court will only address the alleged First Amendment violation of free speech as it pertains to Olbek.

**B. Olbek**

With regard to Olbek, the Court will examine (1) whether he spoke as an employee or citizen, and (2) if his speech addressed an issue relating to the mission of his employer or a matter of public concern. *Boyce v. Andrew*, 510 F.3d 1333, 1342 (11th Cir. 2007) (citing *D'Angelo*, 497 F.3d at 1209). "The Supreme Court has clarified and simplified this inquiry by holding that 'when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.'"

16

*Id.* (quoting *Garcetti v. Ceballos*, 126 S.Ct. 1951, 1960 (2006)).   This involves an examination of the content, form, and context of the speech.   *Connick v. Myers*, 103 S.Ct. 1684, 1690 (1983) ("Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.").

Also, the fact that an employee's speech was made in a government office does not transform the speech into a matter of public concern.   *Anderson v. Burke County, Ga.*, 239 F.3d 1216, 1220 (11th Cir. 2001).   "Factors such as the employee's job description, whether the speech occurred at the workplace, and whether the speech concerns the subject matter of the employee's job may be relevant, but are not dispositive."   *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015).   As the Supreme Court noted in *Garcetti*, '[t]he proper inquiry is a practical one.'   *Id.* (quoting *Garcetti*, 547 U.S. at 424). "A court must be mindful that an employee's speech is rarely entirely private or public, and that it is the 'main thrust' of the speech that must be determined."   *Partington v. Scott*, No. 2:06-cv-310-FtM-29DNF, 2007 WL 1871136, at *4 (M.D. Fla. June 28, 2007). "[T]he relevant inquiry is not whether the public would be *interested* in the topic of the speech at issue," it is "whether the *purpose* of [the employee's] speech was to raise issues of public concern."   *Maggio v. Sipple*, 211 F.3d 1346, 1353 (11th Cir. 2000).

Here, it is undisputed that Olbek wrote the Mold Memorandum that was disseminated to Tuck and to the employees of the police department.   Olbek, as the Deputy Chief of Police, was the second highest ranking police official at the time he sent the Mold Memorandum.   As Deputy Chief of Police, his role was predominately administrative and

included the daily operations and management of the department.   Olbek wrote the Mold Memorandum using his Wildwood Police Department letterhead and sent it while he was in his office at work.   Olbek's Mold Memorandum addressed health issues specific his subordinates, the City's unsuccessful attempts to mitigate the mold issues in the police department building, the City's failure to provide the air filtration results to his employees, and recent tests indicating that the police department building may have mold and asbestos. Olbek's memorandum also requested testing for all police department personnel.   Olbek's memorandum was specific to the air quality issues of the building that housed the police department and the potential exposure to his subordinates.

The Court concludes that Olbek's concerns were specific to the police department building and his subordinates who were potentially exposed to the mold and asbestos in the building.   Olbek's Mold Memorandum was consistent with his administrative duties within the department.   In the absence of evidence that he spoke in his capacity as a citizen rather than as a Deputy Chief of the police department, the Court concludes that the "main thrust" of Olbek's internal Mold Memorandum was to address the health of the police department employees and was made primarily in his role as Deputy Chief of Police, rather than as a citizen.   *See Morgan v. Ford*, 6 F.3d 750, 755 (11th Cir. 1993) ("Rather than categorize each phrase the employee uttered, we consider whether the speech at issue was made primarily in the employee's role as citizen, or primarily in the role of employee."). The Court concludes that Olbek failed to establish the threshold inquiry in order for Olbek's speech to be protected under the First Amendment.

### III.    Qualified Immunity

MuHugh argues that Plaintiffs' First Amendment retaliation claims fail and the issue of qualified immunity is moot because Plaintiffs were not subject to any adverse employment action.    Nonetheless, McHugh argues that qualified immunity applies because he did not violate Plaintiffs' constitutional rights.   In response, Plaintiffs argue that they were constructively discharged.

"Under the qualified immunity doctrine, government officials performing discretionary functions are immune not just from liability, but from suit, unless the conduct which is the basis for suit violates clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Sanders v. Howze*, 177 F.3d 1245, 1249 (11th Cir. 1999).   "Qualified immunity protects all but the plainly incompetent or those who knowingly violate federal law; it does not extend to one who knew or reasonably should have known that his or her actions would violate the plaintiff's federal rights." *Gaines v. Wardynski*, 871 F.3d 1203, 1207 (11th Cir. 2017).

Here, as the Court previously concluded, there is no evidence that McHugh's conduct violated Plaintiffs' constitutional rights.   McHugh only authorized the sheriff's office to investigate the cut drywall in the police building.   At that time, the building was closed due to concerns of mold and asbestos and the police department employees who were near the immediate area when the cut drywall was discovered denied any knowledge of the incident.   There is no evidence that McHugh knew who was responsible for the incident at the time he authorized the sheriff's office to investigate the incident.   And, it is undisputed that McHugh was not responsible for the charges, arrests, or prosecution

pertaining to the defacement of the police department building.   Plaintiffs voluntarily resigned from their positions at the police department and were not subject to any adverse employment action.   Plaintiffs' constitutional rights were not violated.

## IV.   Violation of Plaintiffs' Rights under the Florida Whistleblower Act

The City also seeks summary judgment on Plaintiffs' claims for violating the Florida Whistleblower Act.   "Under Florida's [Whistleblower Act], which prohibits retaliation against whistleblowers in public employment, a municipal government entity may not take an adverse personnel action against an employee in retaliation for the employee's disclosure of the municipal entity's misconduct."   *Wagner v. Lee County*, 678 Fed. Appx. 913, 921 (11th Cir. 2017).

Plaintiffs' claims under the Florida Whistleblower Act fail for two reasons.   First, there was no existing misconduct of the City.   There was no "whistle blown" about any specific issue or existing cover-up.   In fact, after the Mold Memorandum, the City began investigating the mold and asbestos concerns and issued memoranda restricting access to the police department building.   Second, as the Court previously concluded, Plaintiffs were not subject to an adverse employment action.   In the absence of municipal misconduct and an adverse employment action, Plaintiffs are unable to establish a *prima facie* case of retaliation under the Florida Whistleblower Act[3] and the Court need not

---

[3] To establish a violation of the Florida Whistleblower Act, the employee must show that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) there existed a causal connection between the protected activity and the adverse personnel action.   *Wagner*, 678 Fed. Appx. at 921.   Once the employee establishes a *prima facie* case of retaliation, the burden shifts to the employer to establish that there was a legitimate, non-retaliatory reason for the termination.   *Id.*   The burden then shifts back to the employee to show that the employer's legitimate, non-retaliatory reason is merely pretext for prohibited retaliation.   *Id.*

examine the remaining elements of Plaintiffs' claims.   The Court also notes that the parties neglected to brief this claim further.

## **CONCLUSION**

In sum, Plaintiffs' resignations were not because of thier exercise of free speech, but because of a criminal investigation concerning an unauthorized entry into and defacement of the police department building.   Plaintiffs' whistleblower claims fail because there was no existing misconduct upon which a whistle was blown.

Even if the resignations were related to the exercise of free speech, Rogers did not engage in protected speech and Olbek failed to establish that his speech was protected because his speech was made as an employee and did not pertain to a matter of public concern.   And Plaintiffs' failure to establish an adverse employment action is also fatal to their claims.

It therefore ORDERED AND ADJUDGED that:

1.    Defendant City of Wildwood's Motion for Summary Judgment against Plaintiffs (Dkt. 34) is granted.

2.    Defendant Jason McHugh's Motion for Summary Judgment against Plaintiffs (Dkt. 35) is granted.

3.    The Clerk of Court is directed to enter Final Judgment in favor of Defendant City of Wildwood and Defendant Jason McHugh and against Plaintiffs.

4.    The Clerk of Court is further directed to close this case and terminate pending motions, if any, as moot.

**DONE** and **ORDERED** in Tampa, Florida, this 17th day of July, 2020.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record